Senator for Biological Diversity v. Army Corps et al., Ms. Lopez, we're ready when you are. Good morning. May it please the Court, my name is Jacqueline Lopez and I represent the Conservation Organization Appellants in this matter. This case concerns the Army Corps' violations of the National Environmental Policy Act and Endangered Species Act with regard to phosphate mining in Florida. Conservationists raised three issues on appeal. First, that the Corps violated NEPA when it refused to analyze phosphogypsum, which is the radioactive waste product of phosphate mining. Second, that it violated the National Environmental Policy Act, NEPA, when it refused to prepare an environmental impact statement for the South Pasture Extension. And third, that it violated the Endangered Species Act when it did not consult on its area-wide review of phosphate mining in the Central Florida Phosphate District. With respect to the first issue, having to do with the indirect effects that are explained at 40 CFR 1508.8. About that, excuse me for interrupting you. In the District Court order, Judge Miradei said that, did he find that the Corps had considered the cumulative effects? Is that your reading of his order? Yes, Your Honor. That the Court made a finding with respect to the Corps analyzing cumulative effects and that it did not have an obligation to look at the indirect effects. So that's what we're talking about today. Yes, Your Honor. I don't think I've ever had a case with a record of 316,000 pages, so I just wanted to make sure I was... That's correct, Your Honor. Okay. Thank you. Yes. And so with respect to 40 CFR... And he counted it as an indirect effect, the stacks, right? No, Your Honor. That was not reviewed by... I'm sorry. The agency did not consider that as a direct effect. A direct effect or an indirect effect. That's correct. Yes, Your Honor. And so 40 CFR 1508.8, which is the regulation that implements NEPA and explains what an authorized action but occurs later in time or farther in distance, but is reasonably foreseeable, like growth-inducing impacts. And here, the radioactive waste product of phosphate mining is reasonably foreseeable, like those other courts that have looked at reasonably foreseeable impacts. So the record says that the phosphate rock that is going to be mined from the South Pasture Extension Mine, that all of it will be taken to the nearby fertilizer plant and turned into fertilizer. And that anytime you make fertilizer, so you need to take the phosphate rock, you apply sulfuric acid, and that's what produces the phosphogypsum, this radioactive waste. Is it five to one ratio? Yes, Your Honor. So about a 30... The record says that about 30 million tons of radioactive waste are produced in Florida every year to make fertilizer. This is a ridiculous question, but where do the other four parts come from? Your Honor, that information is not in the record. Okay. Good enough. Let me ask you this about that, because the stack seems to be, to me, one of your more compelling arguments, at least visually. You point to and rely on a core regulation in support of your argument, 33 CFR Part 325 ABB, Section 7B, et cetera. But that's their regulation, and neither of you really dwell on, as far as I can tell, mention much of our in Seminole Rock. Doesn't the agency get some serious deference, at least for the time being, under those decisions for the interpretation of the regulation? Yes, Your Honor. The agency is entitled deference for interpretation of its regulations. However, appellants don't raise the regulation as the reason for why indirect effects analysis should or should not be applied. That's actually a defense that the Army Corps has raised, and it comes from this judicial concept of independent utility. So our argument is just that the regulations that implement NEPA explain what indirect effects are, and the court need not look any further. And in fact, there are other circuits that have looked at the test established under public citizen to explain how you analyze indirect effects. In defense, the court says that 33 CFR 325, the site that you just referenced, now that citation actually has three sections. The first section explains how the district engineer is supposed to go about identifying the scope of the activity. The second section goes into more detail about that. And the third section, at the end of the third section, it says that in all cases, you must use the same scope that you use for benefits as you do for analyzing alternatives and impacts. And so if we are to rely on those regulations, the agency is only entitled to deference so far as it has actually looked at those regulations, and that third part of that section is completely omitted from the analysis. But I thought you were arguing the regulation in your favor, not that the agency was arguing the regulation in its favor. And if it's a defensive interpretation of the regulation, I don't see how they have to raise the regulation. So my understanding of their argument is that they don't have to look at indirect effects if those effects have independent utility from the underlying action. And we argue that you don't even have to... I understand that. Yes, Your Honor. Which may be moved in a few months. But when you argue a regulation against the agency action, it seems to me that the court can consider that the agency has obviously not interpreted it the way you're interpreting it, and we may owe some deference that way, does it not? Correct, Your Honor. And so in this instance, if the court determines that independent utility applies in the determination of whether or not they analyze indirect effects, and that Appendix B is applicable in this case, our argument is that you have to look at Sections 1, 2, and 3 of that Subpart B. The agency has only looked at Subsections 1 and 2. Subsection 3 explains that regardless of how you're going to do this test, if you're going to say the benefits, and here the benefits are explained in Chapter 1 of the Area-Wide and how this company exists to make fertilizer, that's the benefit, that's the public need for the project. And if that's the scope of analysis for that public need, then it makes sense that you would look at the same scope of analysis, and that's what the regulations require, that you look at the same scope of analysis for considering alternatives and for impacts. And here the court failed to do that entirely. What's your response to the proximate cause, I guess is how you would call the argument, is that this is a permit to put sludge into waters, but it's being challenged because there hasn't been enough concern for examination of the effects, not of the sludge, not of the waters, but of the product that depositing this sludge, I don't even know if sludge is the right word, but whatever it is, the depositing of all that stuff enables the product to be made and then sold and then used elsewhere, far away, and in that very different process, there are some dangers. It does seem extenuated, so the argument is made, well, there's a proximity limitation that's been read by the Supreme Court into the statute. Seems to me if it has, and if it's going to have any purchase, this would be the kind of case where you would apply that limitation. Yes, Your Honor, and the regulations themselves provide a logical stopping point to the reasonably foreseeable impacts, the ones that are found at 1508.8. And other courts have...  Yes, Your Honor. Our briefing relies on the Council of Environmental Qualities regulations that implement NEPA, the National Environmental Policy Act binding on the Corps, and the Corps has adopted. And the 40 CFR 1508.8 explains what that logical limitation is. It's reasonably foreseeable. Sister circuits have looked at indirect effects in these regulations with respect to proximate cause, so cases that have looked at public citizen, that looked at proximate causation and whether there's control and authority to address an indirect effect. So for example, with Sierra Club v. FERC, that established a bright line rule with respect to what a reasonably foreseeable impact might be. And there the court found that, and that was in authorizing a pipeline and the failure to consider greenhouse gas emissions on the tailpipe side. And the court there found that the test would be that... Which court? The Sierra Club v. FERC in the D.C. circuit from 2017. And the court there found that the test could be something like whether a person of ordinary prudence would find that it was substantially likely to occur, that this impact were to occur, such that it would take it into account in analyzing the underlying action. And here we have 100% certainty that the rock that's taken from the mine, because this is at the Army Corps' own records. We understand that this product that's being made and that the depositing of the material into the waters permits this process to go on, will ultimately result in a product which will have the effects of that product, whatever they are. So in that sense, it's foreseeable, but that was the case in public citizen as well. I mean, you could foresee the increase in traffic that they said was not a proximate cause of the regulation. Am I making sense? I mean, I'm just saying it's foreseeable when, of course, if you're making a product, it's foreseeable it'll have the effects that that product has. I'm not seeing how that answers the public citizen question. Sure, Your Honor. And a distinction using that analogy would be, for example, fertilizer once applied to an agricultural field will end up back in the water and perhaps create algae bloom. See, we can foresee that because you just foresaw it. Exactly. So is that covered? Well, Your Honor, we're arguing that this is much more immediate because the record... I know, but I'm not seeing, I guess, how less it is. Well, the reason is because here we know for certain that all of the rock, this is what the agency has said, this is what... It's going to be used for that purpose. For that purpose exclusively, that industry, this particular applicant owns that fertilizer plant. The record says even that the very viability of the fertilizer plant is dependent on being able to mine the rock. And so we have a situation where the rock, it's only made useful by applying the sulfuric acid, which creates a radioactive waste product. Now this is a waste product that was recognized by the Environmental Protection Agency, which was a cooperating agency in this NEPA process. And in several instances noted in the administrative record, the EPA asked the Corps, it looked like begged the Corps, to look at the effect of phosphogypsum. It says it has long considered phosphogypsum, radioactive waste, to be part of the mining waste stream. And it even suggested questions that should be looked at, like if you authorize the phosphate mining in the Central Florida Phosphate District, this 1.3 million acres, which is almost the What's going to happen? How much phosphogypsum? We're not authorizing the mining though, we're authorizing the activity which is necessary to the mining. They're authorizing the mining itself. Who is? The Army Corps. The permits that are at issue are for phosphate mining, and the mine that's going to be taken is turned into fertilizer. So for example... Where does the Corps get jurisdiction to? Under the Clean Water Act? For the mining permit? Yeah. Yes, Your Honor. 33 CFR... So it's a permit to deposit stuff into the waters. In this case, it's a permit to dredge the waters. So yes, it's Section 404 of the Clean Water Act. And under that act, the Army Corps has the authority to authorize dredging and permitting. And under the National Environment Policy Act, which it is required to comply with in its Clean Water Act obligations, explain that you have to take into account for the purpose of reason, like informed decision-making, and the twin aims of NEPA are informed agency decision-making and public participation. Now while it is a substantive, well rather it's a procedural statute, the purpose, its sole purpose is to achieve those twin aims. And the only way that you do that is by assessing what the impacts are. In the EPA, in communicating with the Corps about the impacts of radioactive waste, said we need to be asking questions like, as a result of this mining, how much radioactive waste is going to be generated? Where is it going to be stacked? What are the environmental impacts of that? The agencies need to know that before they issue a decision, and the public has a right to know that, the communities that live in these areas. Public comments are, and the administrative record shows that there are many public comments from Sarasota County, which is the county that lives south, that is south of these mines and these chip stacks, was very concerned about the fate of the stacks. So that's where the Army Corps gets its authority, and that's the process that happens here that was not evaluated. Thank you. Thank you, Your Honor. Shall I move on to the second issue? Sure. So, with respect to the preparation of an environmental impact statement for the South Pasture Extension Mine, that didn't happen. The real issue here is we have, under NEPA, under the National Environmental Policy Act, we have an environmental assessment that is followed by a record of decision. The regulations at 1508, or 1509.2, say that you only follow an environmental assessment, and the purpose of an environmental assessment is to determine whether or not an environmental impact statement is even necessary, and if it's not, then you have a finding of no significant impact. Those are your two options. But here, the Corps did a third thing, which was create a record of decision on the basis of an environmental assessment. So this is just purely a matter of law, whether or not the Corps followed the regulations that are required. So you would have an issue of FONSI? Well, the record, no, Your Honor. Because the record, and this is not disputed. I was being somewhat rhetorical. Yes, Your Honor. This is showing off that he knows the acronym. The record says that the parties... I'm a favorite one. The record says that there will be significant impacts. The executive summary explains at the tables that are describing the degree and the extent of harm that South Pasture Extension Mine will have significant impacts. That's already on the record. And so what flows from that, if there is to be mitigation that addresses it, that needs to be analyzed, and you conventionally do that with an environmental impact statement when you find that there is significant harm. With respect to the third issue that has to do with the programmatic review of the Central Florida Phosphate District, which is found here to my left at this exhibit. This is just to show you the scale, the scope of the area that's affected. The pale yellow line outlines the scope of what is being looked at here. That's referred to as the Central Florida Phosphate District. That's where the mining reserves are found. The highlighted areas, that pretty blue color at the top, that's all historic mining. Those are in various stages of abandonment or reclamation, depending on when they were created. And south of there, the different colored mines are the ones that you can see that are the four alternatives that were at issue and before the Corps when it went about looking at these cumulatively. Now, the Corps received these permits for mining that would cover over 50,000 acres of phosphate mining and determined that because they were the same activity, the same region, the same time, so they're supposed to occur around the same time, and they shared... Pardon me, you're talking about the Endangered Species Act now? Yes, Your Honor. And because they share similar alternatives, that this was something that they needed to look at in an area-wide environmental impact statement. Now, under the Endangered Species Act, the regulations implementing that act at 50 CFR 402.14 require that an agency review its activities at the earliest possible time to determine whether there's going to be an impact on species. And activities are further described at 402.02. Activities are all actions or programs of any kind carried out, funded, authorized by the agency in whole or in part, including direct... I wanted to ask you about this because, to me, this seems like your weakest argument, which makes me think maybe I'm not really understanding your argument. When I look at the environmental impact statement, it talks about how the mine project may affect the indigo snake, the wood stork, the Florida panther, the scrub jay, et cetera, grasshopper sphera, all that. I mean, wasn't that, didn't that go in the environmental impact statement as a result of a consultation with Fish and Wildlife? No, Your Honor. There was no, and there's no dispute as to whether there was consultation with the Fish and Wildlife Service on this programmatic review. Okay, so your argument is they needed to do that, and the opposing argument is we didn't need to do that. Correct, Your Honor. Thank you. Correct, Your Honor. And the precedent for that... There was consultation at a later stage, is that the... That's right, Your Honor. ...problem is that it wasn't done early enough? It wasn't done early enough, and it also wasn't done on the full program that was reviewed. So the subsequent consultation occurred just on the South Pasture Extension Line, which is that narrow... Which is what the Corps approved. That's correct, Your Honor. That's ultimately the activity that it authorized under 404. So this litigation deals with that part, and there was consultation with respect to that part. It just wasn't adequate because when they did the preliminary overall EIS, they didn't consult at that time. That's correct, Your Honor. Is that your argument? Yes, Your Honor. That is correct. And why, and an example... I mean, on the surface, it seems a little bit non-substantively technical, I don't know. And I'm happy to address that, Your Honor, with respect to the biological opinion that was prepared for the South Pasture Extension Line, for example. In that biological opinion, the Corps and the service did not analyze the effect of the concurrent phosphate mining. For example, the mining that's going to occur just south of that South Pasture Extension Line, because that was considered a future federal activity that would be approved in the future, and therefore not considered as a cumulative impact under the Endangered Species Act. Had the Corps, in 2013 rather than in 2016, on one little mine, looked at its entirety of the action it was going to authorize, which are the four mines, the process resulted in the creation of a mitigation framework that would be used moving forward for any subsequent mines in that region. That's what the record says, that that was the activity. Additionally, yes, you did have to consult on the South Pasture Extension Line. And there is precedent in this jurisdiction under Paulson, the 11th Circuit in 2008 found that FEMA's implementation of the National Flood Insurance Program and issuing eligibility criteria needed to consult at the earliest possible time, because that's what the regulations require at 4.02.14 and at 4.02.02. Likewise, here we have the situation, Your Honors, I'm out of time. Let me ask you to do this for us before you sit down. The South Pasture Mine Extension, which is important in this case, I can't tell from the color exactly where that is. The dark blue that I see within the yellow looks like the dark blue in Tampa Bay. Could you just point it out on the larger one? Yes, Your Honor. Is it up there at about 2 o'clock? Is that it? No. This is the South Pasture Extension Line. This is the 7,500 acres at issue. It is to the south of one of the other mines. Another mine is also being considered. Okay. Yeah, I, the color key is different on your large reproduction than it is on my small page. It looks darker. That's all right. Now that I understand it, I can circle that. Thank you. All right. Mr. Bielut. Good morning. May it please the Court. My name is Charles Bielut. I represent the federal appellees in this case. I think it's important, Judge Rogers, as you mentioned, to think about the agency action that is at issue in this case. The Corps of Engineers has limited authority under the Clean Water Act. This is Section 404, which is a permit provision of the Clean Water Act. The Army Corps of Engineers in this case issued a permit under Section 404 that allows a mining company to discharge dredged or fill material into wetlands, about 1,200 acres of wetlands, in connection with ongoing mining operation. Those wetlands are considered waters of the United States, which the Corps of Engineers has authority to regulate, and that's why it's issuing this permit. The state of Florida and the local county that the mining operation is going to be, they also issue permits. So... Could I interrupt you? So the permit is to put stuff into the water? That's correct, Your Honor. Not to dredge? Well, so one of the things that they do when they mine is they create these giant berms that help contain. And so if they're going to enter wetlands, so Florida, this particular area of central Florida, you have dry uplands that would not be regulated by the Corps, and then you have wetlands. So when they do these berms, if it's going to cross what is considered waters of the United States, they need a permit to do that. So in some cases, it might be excavation. In some cases, it might be dredged material that they're using, earth-moving equipment. They're entering waters of the United States, and in order to do so, they need a permit from the Corps of Engineers. And so that is the agency action associated with this ongoing mine. And so what the agency did was is it said, okay, here's what we've authorized. We've authorized this dredged material or fill material to enter into the wetlands. What are the effects? What are the impacts of allowing that to go forward? And so you look at Chapter 3 of this environmental impact statement, and it goes through, and the Corps talks about what ongoing mines, what the situation on the ground looks like, and it defines the scope that is then considered in Chapter 4 of the environmental impact statement. There's 300-plus pages of analysis of impacts from this mine. All the impact analysis is in Chapter 4, is it not? Correct. Yes, Your Honor. I'm just saying Chapter 3, it talks about the process by which this mining is occurring, and I just wanted to point out a few things in Chapter 3, and I think this is important because it gives you a sense of how this process works. And so what you have is in Chapter 3, it talks about it's AR-0250-400, and it's got like a little diagram, and it shows what's going on. So the mining is occurring, the ore is being excavated from the ground, it's being sent to a beneficiation plant. So in the purpose and need of the project, in general, yes, it is to mine phosphate ore, but there's also practical consideration. The reason why they're extending this mining operation is because they need to be near these beneficiation plants. So the ore gets excavated, it gets put into a slurry, it gets pumped to a beneficiation plant. At that point, it goes through this mechanical process by which the ore is separated. After the ore is separated from the clay and sand and all those kinds of things, it's put onto railcars, and it's shipped. As of then, there's no fissile gypsum or however you say it. That's correct, Your Honor. That occurs, to the extent that that occurs with any phosphate rock that is mined at or near this location, that occurs at a fertilizer processing plant, which is somewhere in the area. When the Corps looked at this, and I want to just be clear about this, when the Corps looked at this, it defined the scope of what's going on. It looked at the Peace River Watershed, and I believe the Myakka Watershed. That's where the mining is occurring. That's where these beneficiation plants are. So at AR, and this is that site that I gave, 250400, they called it the point of severance. That is when the ore itself leaves the area that the mining is going, and it could go somewhere else. Now, plaintiffs, am I in? Say somewhere else. Somewhere else, right. So this is the explanation. How far somewhere else? Are you talking hundreds of miles somewhere else? It could be, Your Honor. Because it's on a railroad. It's on a railroad. It could go on a truck. It could go on a truck to a port that gets put on a ship that gets sent to Louisiana. The point is, on this record, plaintiff's view of this record is, and I believe counsel said this, with 100% certainty, they know where it's going. That's not accurate. And when I want, and this is important, because when the Corps talks about the indirect impacts, and it's true, we cite the same regulation, 40 CFR 15.08.8, caused by the action. So what are indirect impacts caused by the action? They may be further in distance, but they're still reasonably foreseeable. And so what the Corps did, and this is at AR 250, 315, and 16, the Corps gave you three reasons, and this is in the context of what it describes as being independent. So if an activity is independent of mining, it is not caused by, it cannot be an indirect impact. And the Corps made this determination. The Corps applied its expertise when it was looking at this, and it gave three reasons why those impacts that are found at a fertilizer plant, which could be far away, why they are not an indirect impact from the permit that it issued for this discharge of dredged or fill material. And it says, the fertilizer plants operate independent of mining. That's in the record. So what that means is, even if, and you can take their but for, their argument is that but for this permit, these fertilizer plants are going to operate, but the record doesn't support that. In fact, what it says is that Mosaic will, could continue operating its plants. Even if this mine permit had not been issued by the Corps, there are other, there are other, there are other phosphate mines in this, in this area that they are currently, Mosaic itself, there are other companies. So it's not that they could continue to operate the fertilizer plants without the phosphate, it's just they've gotten, that's correct, they've already got permits, those are either permitted or exempt. They have a current source of phosphate, so what you say in the environmental impact statement or what the Corps says is they could import. That's correct, Your Honor. So I have a question about that. Absolutely. Yes. So in, sometime after the environmental impact statement was issued, the Corps requested more information from Mosaic and then in July of 2014, Mosaic sends you something that says the viability of the remaining four Florida concentrate slash fertilizer plants is dependent upon the ability to continue phosphate mining in this, in these areas. So I don't, I mean, the record seems to contradict your basis for saying it's an indirect effect. I mean, they're saying the plant wouldn't be viable if you close these mines. You're saying, well, they'll just get phosphate from somewhere else. Well, so I, there's three reasons why they gave, and I just want to be clear about this. I'm, I have to look, go back and look at what you're citing as to what this communication was that occurred in July. I've got the page number if you want it. But my, I think my, in the environmental impact statement, the Corps goes through and explains why. There's other plant, it went through and analyzed the economic viability of the fertilizer industry and it- Do you rely on the statement of Mosaic? I believe that the environmental, so later you had the environmental assessment. This is another, this occurred after the environmental impact statement. And so there was communication that occurred between the agency and Mosaic that was analyzed in the environmental assessment, which cites back to the area-wide environmental impact statement. So perhaps there are conflicting things in the record that your Honor is pointing to, but I believe, and I think we explained this in our brief, there's a big difference between economic viability. I think that it makes sense. This is that, the Sylvester case from the Ninth Circuit. Like, of course they're allowed, the whole purpose of this is to provide them with phosphate ore that is mined locally. We understand that. We say that in the purpose of need. That's in order to get the ore to a local beneficiation plant. But when you're looking at indirect impacts, and this is what I think is important here, what the Corps did, you have to look at this and say, was it rational for the Corps to reach the conclusion that it did? We are under the Administrative Procedure Act. You look at this record and you say, was it rational for the Corps to look at this and make the conclusion that it did? And so what it said was, there are other manufacturers in this local area that are able to import phosphate ore and they would keep it running. I believe even, there's also instances in the record in which Mosaic said that it could continue using its fertilized plants. So I'm not sure that even that one citation right there would support a finding that the Corps necessarily acted irrationally or was somehow unreasonable in reaching the conclusion that it did. Did the Corps consider the cumulative effect on the stacks? It did, Your Honor. Let me ask you this, wasn't that in Chapter 3 when it talked about the past spills? So when, yes, Chapter 3 is sort of describing the current situation. That's where you talk about the stacks, but I may have overlooked something. But Chapter 4, which you told me previously in my setup question, was where all the cumulative analysis is, doesn't mention stacks, does it? Did I just overlook it? I would have to go, I'm not sure, the way it describes, so what Chapter 4 is doing is it's looking at surface water, it's looking at groundwater, it's looking at water quality, it's looking at ecology, it's looking at all of those things. And it does go through and discuss cumulative effects. And under the regulation, and this is the difference between when you look at the regulation for indirect and you look at the regulation for cumulative effects. Cumulative effects says that you need to look at the past, present, and reasonably foreseeable future actions regardless. All I'm asking you is, is the stacks and the problem of the stacks that we've been talking about so much discussed in the cumulative analysis? Yes, I believe it is. And I don't know, so Chapter 4 is giving the overview of everything that's going on, and it does so in the context of those resources that I was listing. So, I'm not sure that it matters whether it appears in, you know, all the things that were discussed in terms of past, present, and future, and we cite this in our brief in discussing the stacks. Yes, it might appear in Chapter 3, but it informs the analysis that it's contained. That's a lot of words, but I understood your shorter, more concise answer to be that all of the analysis, cumulative analysis, is in 4. And the appendices. So, the appendices, the appendices to the event. In 4. Yes. Which are cited throughout, and also in the environmental assessment that was then issued later before the record of decision was issued. So, there's really two documents that contain environmental analysis. So, if the stacks aren't discussed in Chapter 4, which is the cumulative analysis, isn't that a problem for you? I don't think it is, Your Honor, at all, because you can elevate form over substance here. I mean, I think if you substantially discuss, whether you call it Chapter 3 or Chapter 4, the analysis is there. But, you call it form, other people would call it procedure, which is what NEPA is all about. Absolutely, Your Honor. And NEPA requires agencies to consider the environmental impacts of their actions. And so, that's exactly what the agency did here. And so, at AR, it's 250492. It talks about it at 25282-83. That's where it goes through, and I laid this out in the brief. We talk about the past activity that was involved with these stacks, and the present activity, and then there is no future stacks that are being contemplated in these two watersheds where the mining is to occur. And so, it was not, my argument is, it was not irrational or unreasonable for the court to go about doing its analysis in this way. And so, to the extent that we're concerned about what's going on with water quality, with surface water, ground water, the stacks were considered in that analysis. And also, in the appendices, I pointed this out in my brief, there's analysis of a regional level. All of those effects would have been captured in a lot of that analysis. So, my argument is just that the court complied with the regulations that it needs to comply with. It identified the correct legal standard, and it applied it. Counsel, I want to sort of compare and contrast your approach with your colleague's approach, who's the mosaic, I guess, right? As I see their argument, which made a certain amount of sense to me, which was that there's a permit for the mining process, and there's an effect from a manufacturer that uses what's mined. Right. Right. And that use, that manufacturing, that processing of the mined product could be at a very distant place and would normally, if you're worried about the effects of that manufacturing, you would deal with those that regulate the manufacturer rather than those who are regulating the miner. That seems like a proximate cause kind of limitation, whereas all of this independence stuff, you have to get into the market and how necessary it is and all of that, and it doesn't seem as intuitively acceptable. So, is there some weakness of your co-counsel's argument that causes you not to make that argument very much? I mean, you barely cite public citizen. I'm trying to figure out what's going on. Are you with me? Yeah, absolutely, Your Honor. I mean, the CORE, when it looked at this, it did so in the context of what it described as independent utility. I don't see that as conflicting in any way, shape, or form. The different terminology for the same idea is... Correct, Your Honor. It's the same exact thing. So, in public citizen, what you had was, you're looking at this... So, you say public citizen supports you. Absolutely, Your Honor. I just think that whether you call it proximate cause, whether you call it, you know, whether it's independent, my point is just that public citizen says that you have to look at what the agency has authority to prevent the impact that it's looking at, and you're absolutely right. The state of Florida and the U.S. Environmental Protection Agency, they are the ones that regulate the fertilizer processing. The CORE has no role whatsoever. The CORE's role here is to issue a permit that allows the discharge of dredge and fill material into waters of the United States, over 1,200 acres of wetlands, that occurs somewhere separate and apart from what ultimately occurs with the phosphate ore. And my point was just that when the CORE looked at this, it gave three reasons why that's not... The fertilizer processing plants are not an indirect impact from its permit to authorize this discharge of material, and those are the reasons that it gave. And so, my argument is just that those were rational reasons that the CORE gave to reach the conclusion that it did. Everything in public citizen supports it, and I believe the Florida key deer case that plaintiffs rely on, it explains public citizen. It says that an agency can't be held accountable for effects over actions that it didn't take. So, this is... That's exactly right. The Sierra Club versus FERC, there's a lot of discussion of that. Even in the FERC case, I mean, FERC's legal analysis, it has to provide a satisfactory explanation of the impacts that it either considered or didn't. FERC provided no explanation, and that's very different from the record in this case. So, I don't see public citizen... How do you distinguish the D.C. Circuit case that you're opposing counsel relied on? Salal or Sal... Sable Trail, they're calling it. Yeah, yeah, yeah. That's the Sierra Club versus FERC. It's a D.C. Circuit decision from 2017. It involved the construction of a natural gas pipeline, and the pipeline went directly to the power plant. In this case, on this record, and this is my point that I was making earlier, the CORE, we know that the phosphate ore goes directly to a beneficiation plant. We know that. It gets put into a slurry. There's literally a pipe that connects the mining operation to the beneficiation plant. That is where the ore itself is separated from all these other materials. Then it gets put on a railway, a railway truck, or it gets put on a semi-truck, and it gets shipped somewhere. What the CORE did is it looked at that and it said... It described it as the point of severance. It said, that is where our analysis of impacts, and we're going to look at this giant area, the geographic area, but we're not going to look at fertilizer processing. Why? Because we know that there are other uses for phosphate ore. We know that other manufacturers can use it. We know that Mosaic may put it on a barge and ship it to Louisiana. Plaintiffs provide no limitation to the test that they espouse. If you adopt their version of indirect impacts, where do you draw the line? They don't provide you with a line. Indirect impacts, do I go look at when the fertilizer gets put on the farm? Where does the CORE draw the line? The CORE, in this case, applied its expertise and reasonably concluded, based on the record that it had before it, that this is where it draws the line. Under the Administrative Procedure Act, that was not an arbitrary or capricious decision by the CORE because they provided a reasonable explanation, and this court should affirm the judgment in favor of the federal agency. Let me ask you a question on my time. I know this is a small matter, but the Payne Creek watershed... Yes, Your Honor. ...which is already the most heavily mined watershed, which is what the CORE itself stated... Yes. ...concluded, the CORE concluded, it's not expected that mining this relatively small percentage of the overall watershed, sub-watershed, would have a measurable additional effect on flows within the sub-watershed. Right. On that theory, there's just 409 acres, one-half, one percent. Is there anything behind the expectation it wouldn't have a measurable impact other than it's just a de minimis percentage or de minimis area? Is that it? That's the reason that the CORE gave, but also when you look at the regulation and Plaintiff Cite, the same regulation that I do, it tells you that you need to look at significant impacts. And so what the CORE did, again, is applying its expertise, looked at this and said, it's 400 acres of, and I don't know off the top of my head, 100,000, whatever it is, the, you know, substantial portion of this watershed. Okay. I couldn't tell the expectation if there was anything else in it. Thank you, Counsel. Thank you, Your Honor. Mr. Sibley, seven minutes. Good morning, and may it please the Court, George Sibley for Mosaic Fertilizer. Judge Carnes, I'd like to start with the question you put to Mr. Bielert regarding cumulative impacts and the discussion in Chapter 4, in particular in Section 4.12. The petitioners, excuse me, the appellants make much of the fact that there's no specific mention of the chip stacks in that section, and you would not expect there to be a mention of facilities in the discussion of impacts. The cumulative impact section discusses impacts to the environment of your facility that accumulate with impacts past, present, and reasonably foreseeable future impacts. Now, there's only one of these phosphogypsum stacks within the watershed that's affected by the South, the watersheds that are affected by the South Pasture Extension Line. One current one, right. One current one, and it is inactive in the process of being closed. The remainder of them are outside of the watershed, and it is true that in the past, so with respect to surface water resources, you're only concerned with that one watershed. Now, the groundwater, the geographic scope of review when it comes to groundwater is broader, and it captures the other active and closed chip stacks. To the extent those facilities have impacted the environment, those impacts are documented in Section 3 of the EIS and in Section 4 where they discuss all of those impacts, and that the impacts of those past and present activities, those are all captured in Section 3 and Section 4. Under CEQ guidance from 2005, it's entirely appropriate for the agency to do exactly what the Corps did here, which is to aggregate all of those impacts and present them as a baseline, and then look at how the activity being authorized accumulates with respect to those conditions. What are the stacks mentioned in Chapter 4? The stacks are not, I don't believe the stacks are mentioned specifically called out in Chapter 4, but nor are any of a host of other facilities that impact water quality within these watersheds. Therefore, it's even more defective than I thought in my question. Well, no, and I hope to disabuse you of that notion, Judge Garns, if you'll allow me. The point here is to aggregate the impacts and not focus on specific activities. I'll quote the language from the 2005… How can you aggregate the impacts without considering the individual impacts all together? First this one, then that one, then this one, we add them all together. In general, that's correct, but that results in an actual measurable environmental consequence that you can detect. First of all, the phosphogypsum stacks do not create effects that are cumulative to the effects of the mine. They are there, they exist, and they were considered, but they are regulated under Florida's Phosphogypsum Management Program. They don't discharge water into the environment regularly. They're heavily regulated, and they don't, except in the instance where there have been upsets, they don't discharge into groundwater. Now those incidents have happened, and those are documented in the Area-Wide Environmental Impact Statement. And to the extent that those impacts have altered the pH, that have had any other effect on groundwater that would be concerned about, those conditions are measured and documented in Chapter 3 to evaluate whether any impacts from the South Pasture Extension Mine would add to those baseline effects and create new effects that we need to be concerned about. The algae spawning effect is on surface water only, is that correct? Algae spawning is on surface water, yes, and that's not involved here. So you would not expect specific call-out of individual facilities in the cumulative impacts discussion. The one exception would be if there were to be a new gypstack created, planned, whether caused by this facility or another, and there are no new gypstacks planned within the relevant geographic area going out into the foreseeable future. So I would urge the Court not to focus overly much on the fact that there's no mention of phosphogypsum stacks in Section 4. Turning to the question of proximate cause, Judge Rogers, we certainly like the public-citizen analysis, and we believe that provides the correct framework for the Court to decide. And the key factor here is the break-in causation that occurs. Phosphogypsum stacks are thoroughly regulated by the State of Florida and by EPA under the Resource Conservation and Restoration Act. And those independent authorities dictate whether those phosphogypsum stacks have any impact on the environment at all, and those are decisions for the State of Florida and for EPA to make. The Court's action here is fairly narrow, as Mr. Bieler mentioned. The Court authorizes the discharge of dredge and fill material into waters of the United States. There are 1,200 acres of such waters identified within the South Pasture Extension Mine. Now the Court broadened the lens. They did not narrow their focus on just those 1,200 acres. They looked much more broadly at the entire 7,000 acres of the South Pasture Extension Mine. But the break-in causation occurs when the rock leaves the beneficiation plants and goes to those distant facilities. It is there that whether the Court has no ability to control whether those facilities cause any impact on the environment at all. But, I mean, if they don't issue the permit, the mining stops, and so there's no product from the— That's true, and I would refer—the best case on that particular question, Judge Martin, is the Fourth Circuit's case in Ohio Valley Environmental Coalition that we discussed in our brief. Judge Gregory, in that case, describes a surface coal mine where the Court had a very narrow focus on discharges into waters of the United States in streams and valley fills. There, as here, had the Court not issued the permit for the discharge of dredge and fill material, you would not have been able to have the broader mine be constructed. But the upland portions of that mine were under the control, under the exclusive control of the state, under the West Virginia Department of Environmental Protection. We have to talk about this. I mean, for my part, you know, that's just very different from where the United States has entered into a treaty that says Mexico's trucks can come into our country, and, you know, the President has to order compliance with the treaty after the issue's been to mediation. I mean, that is something very different in public. I mean, and in that case, though, even that was not deemed to—I see my time. I'd love an answer. Well, and in that case, even though the treaty dictated that the President lift the moratorium, the Supreme Court held in a nine-to-nothing decision that that action, that the action promulgating the regulations, that were a conditioned precedent. You could not have—the President could not have lifted the moratorium without those regulations being promulgated. But here, you know, if the Corps hadn't issued the permit, then all this byproduct— Yeah, I thought your argument was, but for a cause, won't cut it. But for a cause, won't cut it. It needs to be proximate cause. That's exactly correct. Let me tell you, public citizen seems like a no-brainer to me. I mean, the President says, I'm going to lift the moratorium, but I need some safety regulations. Well, what is the agency supposed to do? Say, no, we're not going to issue any safety regulations, so you can't lift the moratorium, and therefore the environment will be protected? That's just—I didn't read the lower court decisions that led the public citizen to ones that went the other way, but it seems far removed from this situation other than just a but-for cause. Well, I think, if I may respond, Your Honor, in public citizen, yes, the agency was under a legal compulsion to act on this particular issue, just as the Corps was under a legal compulsion to act based on our application for a permit for the discharge of dredge and fill material. There, though, the impact, the downstream impact that would occur, increased emissions from truck traffic, would only occur if the President lifted the moratorium. Same here. Impacts from phosphogypsum stacks are within the control of different agencies, and whether they create any impacts at all has to do with the compliance with those permits and the agency's decisions about how those facilities will be separately permitted. Let me ask you one other question. It's not directly relevant at all to this, but it's close enough. I hope I can get away with it. Nitrogen, phosphorus, potassium, the three numbers on the fertilizer stack that most of us have used. A few years ago, the central number in a lot of retailers on the fertilizer stack went to zero because there was a concerted voluntary effort to avoid putting more phosphorus into the waterways. And then after a year or two of feel-good advertising, the number came back. Was there ever any kind of regulatory involvement in that, keeping down the phosphorus number in the homeowner's fertilizer bag, 25 pounds of fertilizer? I mean, phosphorus has bad effects on the environment, particularly on surface water. And I thought then that, well, somebody's getting the handle on this, but apparently not. Your Honor, I wish I knew the answer to your question. Unfortunately, I don't. That's okay. Yeah. I want to just follow up with you about this response to the request for information. And it's a document. It's a mosaic document. The date is July of 2014. You say in that document the viability of the remaining four plants is dependent upon the ability to continue the mining. Are you familiar with that document? I am familiar with that document. Is that still true? Well, it's certainly the case that Mosaic is a vertically integrated company, and the economics are such that it is highly desirable to – well, I'm going to get there. It's highly desirable to produce at the fertilizer plants to mine phosphate rock that we locally generate. As opposed to import. As opposed to import. It is more expensive to import, and the market for producing fertilizer is highly competitive. Were you to increase a cost in that respect, it would affect the financial viability. The viability is dependent on the mines continuing. It is. Now, that does not mean the mines cannot import, and they do import. They've imported 1.5 million tons of – In our economic system, if the viability is dependent on it and you don't have it, you're no longer having a viable operation, and people don't do things for the good of agriculture. Well, that is a fair point, Your Honor, but I would argue that that's not the test. I understand. It's just that it's necessary. If economic viability is dependent upon it, then from your company's perspective, it's necessary that this continue. We certainly – it's certainly desirable for this to continue. That is correct. Thank you, counsel. Ms. Lopez, we'll give you a couple extra minutes as well. If you could set it at six. There we go. Thank you, Your Honor. So, going directly to indirect impacts and where to draw the line, Judge Rogers, you had been asking about. In this instance, I think that's found very simply at the Corps' own regulations, and it does have to do with what's at the heart of the matter, which is fertilizer. So, if the purpose is to create fertilizer, and that, I think from the record, is pretty clear what the purpose of getting these phosphate mines approved is, then at the very least, that next step that requires creating fertilizer, the waste product, the waste stream, which the EPA has long considered to be part of phosphate mining's waste stream, should be considered as an indirect effect. That's found as part of the Appendix B. It's also found at the rules for implementing the Clean Water Act at 33 CFR 320.4 that have to do with the balancing that the Corps must do in deciding whether or not to allow a 404 permit to move forward. And that says that you have to balance what you consider to be the reasonably foreseeable benefits of a project with what you think are the reasonably foreseeable detriments. And in balancing that, that process, that analysis, should result in your decision of whether or not to authorize the permit or to condition it. And the Corps has ample discretion to condition, and that's found in the 2008 Mitigation Rules. That's found in Chapter 5 of the Area-Wide Environmental Impact Statement that sets forth the mitigation framework. Condition what now? You're conditioning the grant? Yeah, the Army Corps has the discretion. Conditioning the grant on what? On avoiding? On refusing to insist that the stuff you're selling to other people will be used in a way that doesn't cause pollution where you're manufacturing using the stuff that's— is that what the condition would sound like? See, I'm having trouble seeing how the condition would work. Sure, Your Honor. With respect to the radioactive waste itself, so the Army Corps has authority to condition a permit that takes into account avoidance, minimization, and mitigation. I'm having trouble seeing how that would work. Yes, Your Honor. Yeah, you can condition it, but where the causation or independence is tenuous, it's hard to imagine realistic. You could just say, no, we're not going to give it to you. We don't want you to make this stuff because it's too dangerous. So we're going to approve this on the condition that it can't be sold to manufacturers who are going to use it? Well, so not necessarily, Your Honor. With respect to a hypothetical of what a condition might look like, we know that there are two dozen stacks in that Central Florida Phosphate District, and we know that they are prone to spills and leaks. And so, for example, one condition could be that you have to alert the community nearby when that happens. You have to what? That could just be alert the community that lives nearby the district. But this is a condition on the miner, not on the manufacturer. The manufacturer has to alert the community, or the miner has to alert the community? I'm sorry, Your Honor. In this case, the applicant is that same entity. It is both the miner and the manufacturer. But hypothetically, it's not. I mean, in terms of what they do, it could be someone they're selling. It's a different process, right? I mean, they just have to be one. If it's because they're one big company, is that the reason? Well, the reason is because, as Judge Martin was pointing out at the record at 263-659, it says that all of the rock that they're going to use is going to their fertilizer plant, which isn't just somewhere. It's in the Central Florida Phosphate District. It's nearby. It's deliberately nearby. And as you heard opposing counsel from Mosaic say, they are a vertically integrated company. They produce over half the U.S. domestic consumption of fertilizer. They are competitive because they have captured phosphate mining. They say that they captively produce phosphate, or that's what that means, and they take it to their fertilizer plants. This is a situation very similar to some of the cases in the sister courts that have applied public citizen tests. So with respect to, like, the South Fork Ban, for example, out of the Ninth Circuit, there, in authorizing a gold mine, the court found that you have to look at the indirect effects of processing that gold because that's what you're going to do with it. Similarly, in Wild Earth Guardians, looking at coal mining there, they looked at, well, obviously you're going to be processing this and using this, so there are emissions that are associated with it. That's the foreseeable consequence of this process. We don't have uncertainty that you might find in other instances. The record is very clear with respect to that. I should have asked Mr. Sibley this, but is there any way, I mean, does anybody know how to produce one ton of phosphate without producing five tons of the radioactive waste? Your Honor, all we have on the record is that's what's resulting, that we have 30 million tons of this for the last several decades, being the phosphate chips and the radioactive waste being produced every year, that there's nothing in the record that would suggest that that's not going to continue to happen moving forward. And that could have been one of the things that the Army Corps looked at if it had actually looked at the indirect effects. You know, what is the industry doing to reduce these impacts? But the Corps refused to consider that as a thing that it needed to look at. With respect to cumulative effects, there are questions about, is it in the record or is it not? So I would like to direct the Court's attention to the administrative record where phosphogypsum is referenced, and that happens at 250, 821, and 823. And there, with respect to phosphogypsum, the Corps says explicitly that it does not include an analysis with respect to environmental justice, radiation, cultural and historic resources, surficial geology and soils, groundwater quality, aquatic biological communities, including downstream and listed species. And with respect to the scope that the Corps established for cumulative impacts, if I could just show you here, Your Honor. This is just a piece of land in the watershed. That's what it features with respect to. That is the entire area that we have phosphogypsum at throughout. Only one of which is current, correct? That's correct. So it is a piece of the watershed and a miniscule of the watershed. There's one that is active, but there are, in this entire area, about 2,000. And they're just being exposed to the weather in the hopes that that will reduce the radioactivity and the toxicity, and then that is recycled, correct? That's the theory anyway. Your Honor, that information, what happens with the entirety of the stacks, is not in the record. And so I have an answer, but it's not in the record. Can I ask you about something that is in the record in the environmental impact statement? It says the total surface area covered by active phosphogypsum stack systems, ones that are still receiving phosphogypsum in the Central Florida Phosphate District, is approximately 3,200 acres. Is that right? I mean, that's in the record. That's my understanding as well, Your Honor. Well, I'm a little bit confused then. I thought there was only one currently receiving it, and that used the plural. So, Your Honor, that's the problem with the way that they have looked at chemical effects. So this entire area has several different watersheds. It's not areas that are highly immune that show which way the water is going to fall and which way it's going to go. Oh. That's where there's one current, and there are other current or active ones. That's helpful. I appreciate it. Thank you. That was extremely well argued on both sides, which is not something I say every argument or even every week. He doesn't. He doesn't. We appreciate it, and we'll take that case under submission. Thank you. All rise.